IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 19, 2004 Session

## CECIEL ROS HALPERN v. LAURENCE HALPERN

**A Direct Appeal from the Chancery Court for Shelby County**
**No. D28893-3     The Honorable D. J. Alissandratos, Chancellor**

———————————

**No. W2003-01323-COA-R3-CV - Filed August 31, 2004**

———————————

This is an appeal by the appellant-father from an order awarding the appellee-mother child support arrearage and setting prospective child support obligations. Because the support orders appear to deviate from the child support guidelines without specific findings by the trial court, we reverse and remand for further proceedings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

Marc E. Reisman of Memphis For Appellant, Laurence Halpern

Bradley J. Cordts of Memphis For Appellee, Ceciel Ros Halpern

**OPINION**

Mr. Laurence Halpern ("Appellant") and Ms. Ceceil Ros Halpern ("Appellee") were married on July 2, 1978, and four children were born of this union. On April 10, 2000, Mr. and Ms. Halpern were divorced and were awarded joint custody of their then four minor children. Mr. Halpern was deemed custodial parent of one of the children, and Ms. Halpern was deemed custodial parent of the other three children. The Final Decree of Divorce also ordered Mr. Halpern to pay to Ms. Halpern child support in the amount of $1,000 per month, which allowed for an offset of Ms. Halpern's child support obligation to him.

Because of employment changes, Mr. Halpern moved to Jacksonville, Florida in 2000. Primary custody of the child, who had been living with Mr. Halpern, was transferred to Ms. Halpern.

However, less than two months after this change, custody was again transferred to Mr. Halpern by court order, and Mr. Halpern continued to have primary custody at the time of the hearing.

On May 1, 2002, Mr. Halpern lost his job. On May 9, 2002, he filed a "Petition to Modify Order Changing Custody to Reduce Child Support." In his Petition, Mr. Halpern states that he has

> . . . faithfully complied with [his child support payments,] never missing a payment and never [paid] late. Even when [Mr. Halpern] was temporarily out of work for six weeks during November and December of 2000, [he] utilized savings to meet this obligation. This is mentioned to demonstrate [Mr. Halpern's] utmost respect for this obligation and sincere desire to meet his obligation to support all of his children.

Based on his lack of employment, Mr. Halpern asked the court to reduce his child support obligation to comply with the Tennessee Child Support Guidelines (the "Guidelines").

On June 7, 2002, the trial court entered a "Consent Order on Petition for Civil and Criminal Contempt and for Modification of Child Custody and Support" (the "Consent Order") which, *inter alia*, dismissed with prejudice the petition and counter petition for contempt. The Consent Order also provides, in relevant part, that:

> 10. Pending employment of Laurence Halpern neither party will have a child support obligation to the other. Laurence Halpern shall, immediately upon becoming employed, notify Ceciel Halpern of his income, at which time an order setting child support shall be entered in accordance with Laurence Halpern's earnings at that time and the then existing Tenn. Child support guidelines. Laurence Halpern shall on the 15th of April of each year provide Ceciel Halpern documentation of his annual income.

Mr. Halpern remained unemployed until February, 2003, when he started his own business. At that time, and pursuant to the Consent Order, Mr. Halpern informed Ms. Halpern in writing that he was employed at an annual salary of $30,000.

On March 12, 2003, Ms. Halpern filed a "Petition and Affidavit to Enforce Child Support," requesting child support arrearage from the time of Mr. Halpern's employment in February 2003. The hearing on that Petition was held on April 21, 2003. There is no transcript of this hearing. However, the "Amended Statement of Evidence and Proceedings" which was approved by the trial judge and filed, reads, in relevant part, as follows:

> 4. Neither party was represented by counsel at the hearing on April 21, 2003.

> 5. The case was before the Court on Ms. Halpern's Petition and Affidavit to enforce child support filed on March 12, 2003.

> 6. The Chancellor first addressed Ms. Halpern and asked her how much the child support arrearages were. Ms. Halpern replied that she did not have an exact amount.

The Chancellor allowed Ms. Halpern to take her time and calculate the exact amount of arrearages. Once Chancellor Alissandratos realized that Ms. Halpern had not requested arrearages dating back to the Consent Order entered on June 7, 2002, which did not require either party to pay child support to the other, Chancellor Alissandratos requested that the child support arrearages owed by Mr. Halpern date back to [the] Consent Order dated June 7, 2002.

7. Mr. Halpern attempted to interject the fact that there were no arrearages pursuant to the most recent Consent Order which did not require either party to pay child support to the other. Chancellor Alissandratos admonished Mr. Halpern for interrupting.

8. Having been instructed by the Court to remain silent, Mr. Halpern stood by while the Chancellor and Ms. Halpern discussed child support arrearages and determined that Mr. Halpern had a child support arrearage of $10,710.00 from June, 2002, through April, 2003.

\* \* \* \*

11. Mr. Halpern then took the stand and testified that the reason he attempted to interject earlier was to explain that the latest Consent Order did not require either party to pay child support to the other; and, accordingly, there could be no child support arrearage at that time. Mr. Halpern drew the Court's attention to Paragraph 10 of the Consent Order dated March 7, 2002 . . .[1]

12. Mr. Halpern then testified that pursuant to the Consent Order dated June 7, 2002, Mr. Halpern mailed a letter to Ms. Halpern on February 27, 2003, informing her that he had become employed by starting his own business, Sunrise Imaginations, at a salary of $30,000 per year. Ms. Halpern did not dispute that the letter was sent, and a copy was provided to the Court for its review.

13. Chancellor Alissandratos then began questioning Mr. Halpern as to what efforts he had made to find employment prior to that letter going out, and Mr. Halper testified that he had worked diligently practically every day making contacts and networking as much as possible. Mr. Halpern explained to the Court that the job market was difficult, especially in Mr. Halpern's area of expertise. Mr. Halpern gave specific names of several individuals and companies he had contacted for employment. Mr. Halpern indicated that he had made literally dozens of contacts and that he had sent many resumes to prospective employers in an effort to obtain gainful employment.

14. Mr. Halpern testified that as a final option, he decided to start his own business

---

[1] Paragraph 10 of the Consent Order is set out *supra*.

by taking out a Small Business Administration loan and supplementing that with money he had withdrawn from his retirement savings. Chancellor Alissandratos inquired as to how much Mr. Halpern had withdrawn from his retirement savings, and Mr. Halpern responded that the Small Business Administration required him to make a contribution of $45,000, and, accordingly, he withdrew $45,000 from his retirement.

15. Mr. Halpern testified that the start-up business was an option he chose when it became obvious to him that employment opportunities in data modeling, the field in which Mr. Halpern had previously been employed, [were] not available to him. Mr. Halpern testified that he had been living on credit card advances for the past eight months. Mr. Halpern presented to the Court his most recent credit card statements documenting approximately $25,000 in loans.

*    *    *    *

17. Chancellor Alissandratos then ruled from the bench that Mr. Halpern did indeed owe child support arrearages in the amount of $10,710 and that he was to pay that amount either directly to Ms. Halpern or to the Court within seventy-two hours. Mr. Halpern inquired as to how he should get such a large sum of money, and Chancellor Alissandratos said that he should withdraw the money from his retirement account if necessary. Mr. Halpern then explained that withdrawing the money from the retirement account would incur substantial penalties, and the Chancellor explained that it was not his concern.

18. Mr. Halpern explained that since he resided in Florida, he would mail the money to Ms. Halpern or the Court immediately upon receiving the money from his retirement account.

19. The Court then instructed the Bailiff to take Mr. Halpern into custody where he would be held until exactly $10,710.00 was placed in Ms. Halpern's bank account.

20. Mr. Halpern was then escorted from the courtroom in handcuffs to a jail cell in the basement of the Shelby County Courthouse.

21. While in jail, Mr. Halpern was allowed to make a phone call to arrange for $10,710 to be wired from his retirement account to satisfy the Court's ruling from the bench. Mr. Halpern was released from custody later that day.

22. At the time of the hearing, Ms. Halpern had custody of two of the parties' minor children, and Mr. Halpern had custody of one of the parties' minor children. On April 23, 2003, the Court entered an Order requiring Mr. Halpern to pay child support in the amount of $1,020.00 per month.

-4-

23. The Court based Mr. Halpern's future child support obligation by utilizing the child support obligation set forth in the Order dated October 5, 2000.

On April 23, 2003, the trial court entered an "Order on Petition to Enforce Child Support" (the "Order"). The Order provides, in relevant part:

1. That Respondent, Laurence Halpern, shall pay the child support arrearage in the amount of $10,710.00 to bring the child support current through April 2003.

2. That the child support payments as stated in the Final Decree of Divorce entered with the Court on April 10, 2000 be reinstated effective May 1, 2003. Respondent, Laurence Halpern, shall pay child support in two monthly installments of $510.00 each on the 1st and 15th of the month beginning May 1, 2003 and $510.00 each on the 1st and 15th of each month thereafter until there is no longer a child support obligation.

Mr. Halpern appeals from this Order and raises two issues for review, as stated in his brief:

1. Did the Trial Court err in finding that Mr. Halpern had a child support arrearage of $10,710 from June, 2002, through April, 2003, despite the fact that the previous child support Order dated June, 2002, specifically states that neither party would be required to pay child support to the other?

2. Did the Trial Court err in establishing a child support obligation for Mr. Halpern in an amount which far exceeded the amount required by the Tennessee Child Support Guidelines for a person earning $2,500 per month, where Mr. Halpern did not have an opportunity to be heard on the issue, and where Ms. Halpern's income was not taken into consideration despite the fact that Mr. Halpern had primary parenting responsibilities for one of the parties' three minor children?

While the record in the trial court, including the Statement of the Evidence, reveals several major problems with the trial court's decision in this case, we must first consider the main obstacle to this Court's present review of these proceedings. The Order appealed, as set out above, is signed by the trial judge and the date stamped by the clerk is April 23, 2003. However, the Order shows that it was approved by Ceciel J. Halpern and then there is a certification by Ms. Halpern that she sent a copy "of the foregoing" to Mr. Halpern at his address in Florida. There is nothing else on the Order appealed.

Tenn. R. Civ. P. 58 provides, in pertinent part:

Entry of judgment or an order of final disposition is effective when a judgment containing one of the following is marked on the face by the clerk as filed for entry:

-5-

(1) the signatures of the judge and all parties or counsel, or
(2) the signatures of the judge and one party or counsel with a certificate of counsel that a copy of the proposed order has been served on all other parties or counsel, or
(3) the signature of the judge and a certificate of the clerk that a copy has been served on all other parties or counsel.

In the case before us, the Order appealed does not have the signatures of the judge, all parties, or counsel.  It does not have the signatures of the judge and one party or counsel with a certificate by counsel of service on the other party, nor does it have the signature of the judge and a certificate of the clerk that a copy has been served on all parties or counsel.  Thus, the Order appealed is not effective for failure to comply with Tenn. R. Civ. P. 58.  *See Grantham v. Tennessee State Board of Equalization*, 794 S.W.2d 51 (Tenn. Ct. App. 1990); *Gordon v. Gordon*, 1997 WL 304114 (Tenn. Ct. App. 1997); *Aslinger v. Dunlap*, 1987 WL 14624 (Tenn. Ct. App. 1987).

Although a final appealable order has not been effectively entered under Tenn. R. App. P. 3, the requirements of Tenn. R. App. P. 3 may be suspended in a particular case.  *See Bayberry Assoc. v. Jones*, 783 S.W.2d 553, 559 (Tenn. 1990); *Rector v. Halliburton*, No. M1999-02802-COA-R3-CV, 2003 Tenn. App. LEXIS 149 (Tenn. Ct. App. Feb. 26, 2003).

This Court elects to suspend the Tenn. R. App. P. 3 requirement of a final judgment, because it is obvious that the trial court signed the Order from which the Appellant appeals, no one is prejudiced by such a suspension, and as the *Rector* Court said, "judicial economy must intervene at some point in the progress of a lawsuit. . . ."  *Id.*

Before turning to Mr. Halpern's issues, we note that, since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court.  Unless the evidence preponderates against the findings, we must affirm, absent error of law.  *See* Tenn. R. App. 13(d).

**1. Did the trial court err in finding that Mr. Halpern had a child support arrearage of $10,710 from June, 2002, through April, 2003, despite the fact that the previous child support Order dated June, 2002, specifically states that neither party would be required to pay child support to the other?**

Mr. Halpern contends that T.C.A. § 36-5-101(a)(5) prohibits any retroactive modification of the child support obligation set out in the Consent Order.[2]  Because the Consent Order clearly states

---

[2] T.C.A. § 36-5-101(a)(5) (Supp. 2003) governs modification of child support orders and reads, in pertinent part, as follows:

> Any order for child support shall be a judgment entitled to be enforced as any other judgment of a court of this state and shall be entitled to full faith and credit in this state and in any other

(continued...)

that Mr. Halpern will have no child support obligation during his unemployment, he contends that the trial court's subsequent $10,710 judgment against him is invalid as a later modification of an existing child support order. It is true that this Court has consistently held that T.C.A. § 36-5-101(a)(5) specifically bars any retroactive modification of a child support order, and we have made "no distinction between retroactive increases or decreases." **Brown v. Heggie**, 876 S.W.2d 98, 100-101 (Tenn. Ct. App. 1993).

The Consent Order at issue here provides that, pending the employment of Mr. Halpern, neither party will have a child support obligation to the other. The trial court entered this Order finding that there was no income available for child support to be paid by Mr. Halpern. Nevertheless, at the latest hearing, the court established an arrearage of $10,710.00, apparently based on Mr. Halpern's income for the period prior to his unemployment. There was a change of circumstances justifying the trial court's order because of the drastic drop in Mr. Halpern's income because of his unemployment. As noted, Ms. Halpern's petition seeks support only from the time Mr. Halpern became unemployed, but the trial court awarded support arrearage from the June 7, 2002 date of the Consent Order. This was a retroactive modification and is invalid. Accordingly, the order of the trial court awarding the arrearage is reversed.

**2. Did the trial court err in establishing a child support obligation for Mr. Halpern in an amount which far exceeded the amount required by the Tennessee Child Support Guidelines for a person earning $2,500 per month, where Mr. Halpern did not have an opportunity to be heard on the issue, and where Ms. Halpern's income was not taken into consideration despite the fact that Mr. Halpern had primary parenting responsibilities for one of the parties' three minor children?**

One of the most fundamental liberties we are afforded as citizens of the United States and of Tennessee is the "notice and opportunity to be heard before [being] deprived of life, liberty, or property." **Mullane v. Central Hanover Bank & Trust Co.**, 339 U.S. 306, 313 (1950). The Tennessee Supreme Court has noted that "it is elementary and fundamental that every individual is entitled to his day in court in which to assert his own rights or to defend against their infringement." **Shelley v. Gipson**, 400 S.W.2d 709, 713 (Tenn. 1966).

Divorce cases involving child support naturally fall within the purview of Due Process protection because they may involve the deprivation of property of the parties involved. **Badged v. Baggett**, 541 S.W.2d 407 (Tenn. 1976); **Tenent v. Tenent**, No. 02A01-9305-CV-0017, 1994 Tenn. App. LEXIS 370 (Tenn. Ct. App. July 6, 1994). This Due Process right is guaranteed to perjurers, **Id.** at *10, alleged deadbeat dads, and Good Samaritans alike. The present case is no exception.

---

(...continued)

state. Such judgment shall not be subject to modification as to any time period or any amounts due prior to the date that an action for modification is filed and notice of the action has been mailed to the last known address of the opposing parties.

The record indicates that Mr. Halpern was not present, due to his incarceration, during the hearing setting his prospective child support obligation. Based on the foregoing, we find that the trial court violated Mr. Halpern's Due Process rights. This is not a case where one of the parties refused to attend a child support hearing, and thereby waived his Due Process rights. Mr. Halpern was not jailed for contempt of court, and the record does not show that he presented a sufficient disturbance to the proceedings to warrant his removal. Essentially, the record reflects that Mr. Halpern could not immediately pay the judgment against him for child support arrearage, thereby somehow waiving his Due Process rights. In the absence of a constitutionally acceptable hearing, we remand for a hearing to determine prospective child support payments. Mr. Halpern should have the opportunity to be present to present evidence, examine witnesses, and defend himself, all of which are guaranteed to him by the 14th Amendment.

This hearing shall also result in a determination of Mr. Halpern's prospective child support obligation under the Guidelines from May 1, 2003. It is uncontested that Mr. Halpern's income from his business from May 1, 2003 is $30,000 per year. However, the trial court set Mr. Halpern's prospective child support at $1,020 per month. The $1,020 is an upward deviation from the Guidelines, *see* Tenn. Comp. R. & Regs. 1240-2-4-.03, and there is no written justification in the Order for this deviation. Consequently, the award of child support from May 1, 2003 forward is invalid.

We remand for a hearing to determine Mr. Halpern's income according to the Guidelines as of May 1, 2003. Any deviation from the Guidelines' presumptive amount of support must be accompanied by a "written or specific finding on the record that the application of the guidelines would be unjust or inappropriate in [this] particular case." Tenn. Comp. R. & Regs. 1240-2-4-.01(2)(2), 1240-2-2-.02(7) (1994); *see also* T.C.A. § 36-5-101(e)(1).[3]

The record shows that Mr. Halpern has already paid $10,710 and is due credit on this amount on his future child support obligation.

For the foregoing reasons, we reverse the Order of the trial court awarding Ms. Halpern $10,710.00 and establishing $1,020.00 per month in prospective child support payments. We remand the case to the trial court for further proceedings consistent with this Opinion. On remand, the court shall also determine the amount of child support due from Ms. Halpern.

Mr. Halpern also requests that we remand the case to "another part of the Shelby County Chancery Court due to the fact that the chancellor below incarcerated Mr. Halpern despite the fact that the chancellor below entered an order establishing an enormous amount of child support arrearage where no such arrearage legally existed." While we agree that incarceration is a "quintessential deprivation of liberty," ***Inmates of Orient Correctional Institute v. Ohio State Adult***

---

[3] Additionally, as guidance, we note that to calculate a child support award based on earning capacity rather than actual net income, there must be a threshold finding that Mr. Halpern is willfully and voluntarily underemployed or unemployed. Tenn. Comp. R. & Regs. 1240-2-4-.03(d); ***Marcus v. Marcus***, No. 02A01-9611-CV-00286, 1998 Tenn. App. LEXIS 55 (Tenn. Ct. App. Jan. 28, 1998).

*Parole Authority*, 929 F.2d 233, 234 (6th Cir. 1991), and therefore a court should carefully examine whether incarceration is appropriate, we decline at this time to transfer this case to another court. This does not preclude Mr. Halpern from making a motion to recuse before the remanded hearing.

      Costs of this appeal are assessed one-half to Appellant, Laurence Halpern, and his surety, and one-half to Appellee, Ceciel Ros Halpern.

 

_____<br>
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.
